Document Number Case Number
53  05-CR-0155-C
United States District Court
Western District of Wisconsin
Theresa M. Owens

Filed/Received
05/10/2006 03:36:50 PM CDT

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

UNITED STATES OF AMERICA,

                Plaintiff,                  SECOND REPORT AND
v.                                           RECOMMENDATION

BERNARDO GARCIA,                                05-CR-155-C

                Defendant.
_____

REPORT

The grand jury has returned gun and drug charges against defendant Bernardo Garcia. Before the court for a second report and recommendation is Garcia's motion to suppress all evidence derived from the government's placement of a tracking device on the exterior of his automobile. This time around, the question to be answered is whether the government can justify its placement of a GPS tracking device on Garcia's car by establishing reasonable suspicion that Garcia was committing crimes, that he was driving this car and that tracking this car would lead to evidence of Garcia's crimes. It also would be prudent for the court to determine whether the agents' information rose to the level of probable cause, although this determination would be dicta.

On April 7, 2006, this court held an evidentiary hearing on Garcia's motion. Having heard and seen the witnesses testify, and having considered all the affidavits and exhibits submitted by the parties, I find the following facts:

FACTS

Tim Schultz has been employed for 30 years as a special agent for the Wisconsin Department of Justice, Division of Criminal Investigation. For the past decade Agent Schultz has focused on methamphetamine cases. Agent Schultz is a DEA certified clandestine lab investigator, an EPA HAZMAT technician, Wisconsin's representative to the National Clandestine Lab Investigation Association, and teaches law enforcement officers about methamphetamine and labs. He has participated in the seizure of 150 meth labs, 300 anhydrous ammonia tanks, and innumerable dump sites and meth lab related incidents.

Agent Schultz and his colleagues first encountered Bernardo Garcia in Polk County in January 2003. An area resident named Don Peterson (whom Agent Schultz described as elderly and "somewhat mentally challenged") reported to agents that Garcia had asked him to buy Sudafed tablets for Garcia at the local Wal-Mart.[1] Agents retrieved a Wal-Mart security video which showed Garcia and Peterson in the store, and a cash register receipt showing that Garcia and Peterson had purchased Sudafed. Also in January 2003, agents arrested a man named David Winger in possession of Sudafed pills and lithium batteries. Winger claimed that he had bought these items for Garcia to use cooking

---

[1] One oft-used recipe for cooking methamphetamine is to mix Sudafed (or another cold pill containing pseudoephedrine), anhydrous ammonia (a liquid fertilizer used on farms) and peeled lithium batteries. The mixture is purified by adding a solvent such as toluene which causes the meth to float to the top in solution. This liquid is skimmed and catalyzed into powder by introducing an acidic gas made by mixing muriatic acid and aluminum foil in a pop bottle. The methamphetamine precipitates out and is strained into a coffee filter.

methamphetamine. Winger told the agents that Garcia had been cooking meth for about six months.

At the agents' behest, Winger made a controlled delivery of the Sudafed to Garcia. The agents followed up with a search warrant for Garcia's residence where they found Pyrex dishes, toluene, muriatic acid, and ground Sudafed pills. Garcia admitted that he was using and selling meth but he would not admit that he was cooking it. Garcia claimed that he knew some cooks and would gather ingredients for them in exchange for a share of the product. Garcia was charged and convicted of this conduct in state court and sent to prison.

In the spring of 2005 Garcia was released from custody and returned to Polk County. After his return, agents found the remnants of a meth lab in a wooded area between the Almena trailer court and a farm co-op whence Garcia had pilfered anhydrous ammonia in '03. The agents knew that David Anderson and his wife, Tiane Lindeman-Anderson (hereafter "Lindeman"), lived in the Almena trailer court. Anderson and Lindeman were known meth users, ne'er-do-wells and running mates of Garcia's. Based on everything they knew up to that point, the agents suspected that Garcia and Anderson were responsible for the recently-discovered meth lab, and surmised that Lindeman might know about it.

So, on May 4, 2005 Agent Schultz and Polk County Sheriff's Investigator Rob Rorvick interviewed Lindeman at the Polk County Jail. The agents weren't sure exactly why Lindeman was in jail at that time but they knew she was a meth addict with a lengthy

criminal history for crimes such as forgery and worthless checks.[2] In response to the agents' questions, Lindeman reported that Garcia had visited her and Anderson at their residence in Almena on four occasions, most recently about two weeks previously. On his last visit Garcia brought his girlfriend (and the mother of his child), Wendy Wilson. Garcia and Wilson drove up in a gray Ford Tempo.[3] Garcia broke out a half-gram of methamphetamine which the four of them shared. According to Lindeman, Garcia announced that he was "tired of playing the game" and wanted to start cooking methamphetamine.

Pursuing a separate investigative thread, Agent Schultz learned in late April that a person had purchased muriatic acid and toluene at the Menard's East in Eau Claire. Agent Schultz viewed a video from a Menard's camera showing Garcia purchasing the muriatic acid and toluene. Garcia was not driving a Cutlass Ciera, not a Tempo.

On May 25, 2005, Agent Schultz and Investigator Rorvick visited the home of Don and Becky Wilson, the parents of Wendy Wilson, Garcia's girlfriend at the time. Also present was Shawna Ashby, Wendy Wilson's cousin. Ashby told the agents that Wendy had asked her if Wendy and Garcia could cook methamphetamine at her home. Wendy told Ashby that Garcia had bragged that he could manufacture methamphetamine in front of a police station and they wouldn't even know about it.

---

[2] Other residents of the Almena trailer court are of the opinion that Lindeman is a thief and a liar; although the agents were not aware of these opinions at the time, they probably would not have been surprised.

[3] Lindeman also reported that she had seen Garcia driving a Ford Taurus four weeks previously and occasionally had seen him driving an Oldsmobile Cutlass Ciera.

The agents asked Wendy's parents if they knew what motor vehicle Garcia was driving at the time. They reported that Garcia currently was driving a gray Ford Tempo that belonged to the Wilson family and was titled to Wendy. They reported that Garcia had been driving the Tempo for a while, although he previously had driven other vehicles of theirs, including their Taurus and Ciera. Don Wilson reported that to the best of his knowledge, Garcia currently was staying at an apartment house in Amery. Agents visited the described location and found the Wilsons' Tempo parked on the street.

On the evening of May 26, 2005, agents covertly installed a "GPS Memory Tracking Unit" on the exterior of the Tempo. As set forth in the first report and recommendation, data retrieved from this GPS led the agents to the evidence underlying the charges against Garcia in this federal prosecution.

In support of his motion to suppress evidence, Garcia submitted an affidavit dated January 9, 2006, in which he stated that he and Wendy Wilson considered the Ford Tempo to be their joint property, that he had his own set of keys, he could drive the car whenever and wherever he wanted and he kept personal property in it.

ANALYSIS

This is the parties' second swing at Garcia's suppression motion. We reached this juncture because this court has concluded that the government must establish that Agent Schultz and his colleagues had reasonable suspicion that Garcia was engaged in criminal

activity and that monitoring the Tempo would produce evidence useful to the investigation. The government previously had not attempted to make this showing based on its belief that no such showing was required of it. Garcia continues to argue that the court should require the government establish probable cause. For completeness's sake, I will address both evidentiary thresholds.

I. Reasonable Suspicion To Attach the GPS Device

Reasonable suspicion is the lowest cognizable evidentiary threshold, one step above an inchoate and unparticularized hunch, but below probable cause and considerably lower than a preponderance of the evidence. It requires only a minimal level of justification for the police action. *United States v. Breland*, 356 F.3d 787, 791, n.1 (7th Cir. 2004). All that is necessary is some objective manifestation that a person is, or is about to be, engaged in prohibited activity.

Ultimately, a court's determination of reasonable suspicion must be based on common-sense judgments and inferences about human behavior. *United States v. Hagenow*, 423 F.3d 638, 642 (7th Cir. 2005). This requires evaluation of the totality of circumstances to assess whether the officers had a particularized and objective basis for suspecting illegal activity that would justify their intrusion. Such an evaluation necessarily considers the experience of the agent and the behavior and characteristics of the suspect. Therefore, agents are entitled to make assessments of situations in light of their specialized training and

6

familiarity with customs of the area's inhabitants, *see United States v. Zambrana*, 428 F.3d 670, 675 (7th Cir. 2005), and the suspect's criminal record, in conjunction with other information, can establish reasonable suspicion, *see United States v. Johnson*, 427 F.3d 1053, 1057 (7th Cir. 2005).

The circumstances relevant to the inquiry are those presented to the officer at the time. *United States v. Askew*, 403 F.3d 496, 507 (7th Cir. 2005); *see also United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006) (regarding probable cause, "courts must focus on the real world situation as known to the officer at that time. The question is whether they had a reasonable belief at the time").

Applying this template to the facts found above establishes reasonable suspicion that Garcia had re-entered the meth world and that tracking the Tempo would lead to additional evidence of this. The agents knew from Garcia's '03 confession and conviction that he had been active in the meth scene and had been caught red-handed with the precursors and raw ingredients for cooking meth. Soon after Garcia's release from custody, remnants of a meth lab were found near his previous source of anhydrous ammonia and proximate to the home of his buddy Anderson. *Post hoc ergo propter hoc* may be a logical fallacy but it has some common-sense application in the real world: just because a disassembled meth lab was found on Garcia's old haunts soon after his return does not *prove* that Garcia was involved, but it triggered a suspicion that was neither inchoate nor unparticularized.

And that's just the starting point. Lindeman, the junkie and chronic swindler, admitted that she recently had shared meth with Garcia and that he had announced his yen to delve into meth cooking. In his post-hearing briefs Garcia vigorously attacks Lindeman's credibility, but there is no persuasive reason to doubt her report: it dovetails neatly with all the other information gathered from other sources by the agents, and it is a logical account of the words and deeds of a meth user like Garcia in the presence of his meth-using friends. However conniving and dishonest Lindeman might be in other situations, Garcia has not successfully impeached her account of what he said and did in her presence.

Next, Wendy Wilson's cousin, Shawna Ashby, reported that Wendy had asked if she and Garcia could use Ashby's home to cook meth. Why would Ashby say this if it hadn't happened? Again, there is no persuasive reason to doubt the veracity of this claim, which forms another brick in the evidentiary wall.

Finally, there is the Menard's video capturing Garcia purchasing muriatic acid and toluene in Eau Claire, probably an hour's drive south of Polk and Barron Counties. Why would Garcia drive so far to pick up a common cleaning agent and solvent? Innocent explanations exist, but under the circumstances already known to the police, the most logical inference was that Garcia intentionally had traveled far from the watchful eyes of the drug agents who knew him in order to pick up ingredients he needed to cook a batch of meth.

All of these facts, considered in their totality by highly-trained veteran drug agents, gave rise to a reasonable suspicion that Garcia was cooking methamphetamine. The next

question is whether it was reasonable for the agents to suspect that the Ford Tempo would lead them to additional evidence of Garcia's suspected crimes.

Garcia contends that it was not, claiming that there is insufficient evidence that he actually was using the Tempo for illegal activity. Garcia's view is that, because the police never saw him use any car for illegal purposes (except perhaps the Wilson's Ciera, which he drove to the Menard's in Eau Claire), they cannot establish reasonable suspicion to put a GPS device anywhere. Garcia also is unhappy that the court cut short his re-cross examination of Agent Schultz in which Garcia apparently was attempting to impeach Schultz's account of what Wendy Wilson's parents told him about the car. Finally, Garcia seems to be hinting that because the car was titled to Wendy, not him, it was unreasonable for the agents to conclude that he was using it.

Let's start by focusing on what the agents were trying to accomplish: they suspected that Garcia had set up a clandestine meth lab and they were trying to locate it. To find the lab, they needed to track Garcia's movements. To track Garcia's movements, they needed to determine the means by which he *currently* was moving about the county. Therefore, it was irrelevant whether Garcia had driven some other vehicle previously, and it was irrelevant whether there was any information indicating that Garcia had used the Tempo for some unlawful purpose. If on May 25, 2005, the agents had learned that Garcia currently was traveling about on a pair of roller skates he had bought the day before from a nun, then on

9

May 26 the agents would have been justified in placing their GPS device on those holy rollers.

The information that the agents obtained from two independent sources was that although Garcia had been driving other cars in the recent past (namely the Wilson family's Taurus and Ciera), he *currently* was driving the Wilson's Tempo. First, Lindeman told the agents that the Tempo was the car in which Garcia most recently had visited, two weeks previously; then Don Wilson reported that the Tempo was the car Garcia currently was driving. This was evidence *beyond* a reasonable suspicion that Garcia was driving the Tempo; indeed, it is undisputed evidence on this record that Garcia cannot seriously challenge.

This was the information known to the agents at the time they applied the GPS device, and it was reasonable for them to rely on it. Neither Lindeman nor Wilson had any reason to mislead the agents on this point. It was completely irrelevant whether Garcia previously had driven different vehicles because the focus wasn't on what Garcia had done in the past, it was on what he was doing on May 26, 2005, when the GPS device was applied. At that time, the information was that he was driving the Tempo. Therefore, to track Garcia, the agents needed to track the Tempo.

A secondary point is that this information was indisputably correct. Because the focus is on what the agents knew at the time, *see Reed*, 443 F.3d at 603,[4] it is irrelevant to

---

[4] "Subsequent evidence of guilt cannot validate the probable cause determination, nor can evidence of innocence invalidate it. Prescience is not required of t h e officers. Instead, courts must focus on the real world situation as known to the officer at that time. The question is whether they had a reasonable belief at the time."

the reasonable suspicion and probable cause analyses whether Garcia actually was driving the Tempo. But Garcia seems to think it matters, else he would not be complaining that the court cut short his attempt to impeach Agents Schultz's failure to write in his report that Don Wilson said that Garcia now was driving the Tempo. Certainly, Garcia cannot contend that Don Wilson told Agent Schultz something else: Garcia has submitted his own sworn affidavit averring that at the time the GPS device was placed on the Tempo, Garcia *was* driving it, and he considered it to be his joint property. Therefore, before the evidentiary hearing even was held, it was an undisputed fact that on and after May 26, 2005, Garcia was using the Tempo. Of course, as just mentioned, this is less important than what the agents actually knew on May 26, 2005, but obviously they knew the truth because they put the GPS device on the Tempo, not the Taurus or the Ciera.

In sum, the evidence establishes that the agents had significantly more than a reasonable suspicion that Garcia had returned to the meth trade and that as of May 26, 2005, his means of transportation was the Wilsons' Ford Tempo. Therefore, it was reasonable for the agents to attach a GPS device on the Tempo. This court should deny Garcia's motion to suppress.

II.  Probable Cause To Attach the GPS Device

11

Although this court has not imposed on the government a duty to establish probable cause to attach the GPS device, the Seventh Circuit might, so we should address the issue prophylactically. As a technical matter, this section of the report is dicta.

Probable cause imposes a higher burden on the government than reasonable suspicion, but not by much. Probable cause exists when the circumstances, considered in their totality, induce a reasonably prudent person to believe that a search will uncover evidence of a crime. *United States v. Mykytiuk*, 402 F.3d 773, 776 (7th Cir. 2005). When the police use informants to establish probable cause, the credibility assessment should consider whether the informant personally observed the events reported, the degree of detail she provides, whether the agents have independently corroborated the information, and the age of the information. *Id.*[5] Put another way, probable cause exists when, given all the circumstances known to the agents, including the veracity and basis of knowledge of informants providing hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. *United States v. Newsome*, 402 F.3d 780, 782 (7th Cir. 2005).

Probable cause is a fluid concept that relies on the common-sense judgment of the officers based on the totality of circumstances known to them. In determining whether suspicious circumstances rise to the level of probable cause, officers are entitled to draw

---

[5] A fourth factor in *Mykitiuk*, a search warrant case, is whether the informant personally appeared before the issuing judge so that the judge could make his/her own credibility determination. *See id.*

reasonable inferences based on their training and experience. *United States v. Reed*, *supra*, 443 F.3d at 603. "So long as the totality of the circumstances, viewed in a common sense manner, reveals a probability or substantial chance of criminal activity on the suspect's part, probable cause exists." *United States v. Parra*, 402 F.3d 752, 763-64 (7th Cir. 2005).

Applying this template to the facts found above establishes probable cause that Garcia had re-entered the meth world and that tracking the Tempo would lead to additional evidence of this. As discussed in the previous section, the totality of circumstances transcended reasonable suspicion and met the threshold of a probability or substantial chance that placing the GPS device on the Tempo would led to evidence of Garcia's ongoing involvement in meth-related crimes. I discussed above the strengths and weaknesses of the evidence available to the agents, so there is little point in repeating the gloss here; the bottom line is that the *gestalt* of the situation viewed by experienced agents who personally knew the witnesses, accomplices and the suspect, surpassed the low evidentiary hurdle imposed by the probable cause standard. If it turns out that the government's actual burden of proof required a probable cause showing, then I would recommend that this court conclude that the government met this burden, and that suppression is not warranted.

In sum, under either burden of proof, it was not constitutionally unreasonable for the agents to place a GPS device on Garcia's Tempo in an attempt to determine if Garcia really had started cooking meth, and if so, where his lab was.

RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1)(B) and for the reasons stated above, I recommend that this court DENY defendant Bernardo Garcia's motion to suppress evidence.

Entered this 10th day of May, 2006.

BY THE COURT:

_____
STEPHEN L. CROCKER
Magistrate Judge

May 10, 2006

David Reinhard
Assistant United States Attorney
P.O. Box 1585
Madison, WI 53701-1585

Patrick J. Stangl
Stangl Law Offices, S.C.
6441 Enterprise Lane, Ste. 109
Madison, WI 53719

      Re:   United States v. Bernardo Garcia
             Case No. 05-CR-155-C

Dear Counsel:

      The attached Report and Recommendation has been filed with the court by the United States Magistrate Judge.

      The court will delay consideration of the Report in order to give the parties an opportunity to comment on the magistrate judge's recommendations.

      In accordance with the provisions set forth in the memorandum of the Clerk of Court for this district which is also enclosed, objections to any portion of the report may be raised by either party on or before May 22, 2006, by filing a memorandum with the court with a copy to opposing counsel.

      If no memorandum is received by May 22, 2006, the court will proceed to consider the magistrate judge's Report and Recommendation.

                               Sincerely,

                               /s/

                               Connie A. Korth
                               Secretary to Magistrate Judge Crocker

Enclosures
cc:    Honorable Barbara B. Crabb, District Judge